IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

OTIS MOORE, and DOROTHY R.　　*
MOORE,　　　　　　　　　　　　*
　　　　　　　　　　　　　　*
　　　　Plaintiffs,　　　　*
　　　　　　　　　　　　　　*
　　　　　　v.　　　　　　　*
　　　　　　　　　　　　　　*　　　1:14-cv-62
WRIGHT MEDICAL TECHNOLOGY,　*
INC.,　　　　　　　　　　　*
　　　　　　　　　　　　　　*
　　　　Defendant.　　　　　*

---

**O R D E R**

---

Presently before the Court are Defendant's <u>Daubert</u> motions

to exclude opinion testimony offered by Plaintiffs' experts Dr.

B. Sonny Bal, Mari S. Truman, P.E., and Dr. Reed Ayers, Ph.D.

(Docs. 51, 53, 54.) Also pending is Defendant's motion for

summary judgment (Doc. 49), which the Court addresses in a

separate order. Below, the Court addresses the admissibility of

the experts' opinions separately. In the end, the Court **GRANTS**

**IN PART AND DENIES IN PART** each of Defendant's motions.

## I. FACTUAL BACKGROUND

The following is a brief summary of the allegations in this

case, provided to better understand the relevance of the expert

opinions discussed below. On March 10, 2014, Plaintiffs Otis

Moore and Dorothy Moore filed a Complaint against Defendant

alleging, in general, that the failure of Defendant's PROFEMUR®

titanium modular long neck, a component of Defendant's hip implant system, injured Otis Moore. (Complaint, Doc. 1.) More specifically, Plaintiffs assert the following causes of action against Defendant:

1. Three distinct theories of strict products liability based on defective design, defective manufacture, and failure to warn the learned intermediary of the device's known risks;

2. Negligence; and

3. Negligence *per se*. [1]

(Id. at 39-43.) Defendant answered, denied liability, and asserted affirmative defenses. (Doc. 9.)

According to the statement of material facts (Doc. 94), Defendant Wright Medical Technology Inc. manufactures and markets the PROFEMUR® hip system, which includes the PROFEMUR® titanium modular long neck. Plaintiff Otis Moore sought relief from hip pain from Dr. R. Scott Corpe. Moore and Dr. Corpe discussed how Moore's career as a professional golf caddy, which required walking and carrying a sixty-pound bag, could adversely affect a hip replacement. On November 15, 2005, Dr. Corpe performed a right hip total arthroplasty on Otis Moore, and implanted an artificial hip including the relevant PROFEMUR® modular neck. Over six years later, on March 19, 2012, Dr. Corpe diagnosed Moore with a fractured PROFEMUR® neck, requiring

---

[1] Although not listed as separate causes of action, Plaintiffs also request loss-of-consortium damages and punitive damages. (Complaint at 44.) These claims are taken up in more detail in the Court's separate Order on Defendant's motion for summary judgment.

Dr. Corpe to perform a revision surgery. As a result of the PROFEMUR® neck's failure, Otis Moore sustained permanent injuries.

## II. LEGAL STANDARD

Federal Rule of Evidence 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"As the Supreme Court recognized in Daubert v. Merrell Dow Pharms., Inc., [509 U.S. 579 (1993)], Rule 702 plainly contemplates that the district court will serve as a gatekeeper to the admission of [expert] testimony." Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340 (11th Cir. 2003). "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999).

The Eleventh Circuit has explained that district courts are to engage in a three-part inquiry to determine the admissibility

of expert testimony under Rule 702.  <u>Quiet Tech.</u>, 326 F.3d at 1340.  Specifically, the court must consider whether:

> (1) The expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

<u>Id.</u> at 1340-41.

First, an expert may be qualified to testify due to his knowledge, skill, experience, training, or education.  <u>Trilink Saw Chain, LLC v. Blount, Inc.</u>, 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008).  A witness's qualifications must correspond to the subject matter of his proffered testimony.  <u>See Jones v. Lincoln Elec. Co.</u>, 188 F.3d 709, 723 (7th Cir. 1999).

Second, the testifying expert's opinions must be reliable.  In <u>Daubert</u>, the Supreme Court directed district courts faced with the proffer of expert testimony to conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  509 U.S. at 592-93.  There are four factors that courts should consider: (1) whether the theory or technique can be tested; (2) whether it has been subject to peer review; (3)

whether the technique has a known or potential rate of error; and (4) whether the theory has attained general acceptance in the relevant community. Id. at 593-94. "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004). Thus, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).

Regardless of the specific factors considered, "[p]roposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known." Daubert, 509 U.S. at 590. In most cases, "[t]he expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." Fed. R. Evid. 702, advisory committee's notes (2000 amendment). "Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough" to carry the proponent's burden. Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla., 402 F.3d 1092, 1113 (11th Cir. 2005). Thus, neither an expert's qualifications and experience alone nor his unexplained assurance that his or her opinions rely on

accepted principles is sufficient. <u>McClain v. Metabolife Int'l, Inc.</u>, 401 F.3d 1233, 1244 (11th Cir. 2005); <u>Frazier</u>, 387 F.3d at 1261. Moreover, when analyzing a witness's reliability, courts must be careful to focus on the expert's principles and methodology rather than the scientific conclusions that they generate. <u>Daubert</u>, 509 U.S. at 595.

Third, expert testimony must assist the trier of fact to decide a fact in issue. Thus, the testimony must concern matters beyond the understanding of the average lay person and logically advance a material aspect of the proponent's case. <u>Frazier</u>, 387 F.3d at 1262; <u>Daubert</u>, 509 U.S. at 591. The Supreme Court has described this test as one of "fit." <u>Daubert</u>, 509 U.S. at 591. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." <u>Frazier</u>, 387 F.3d at 1262-63.

## III.   DISCUSSION

Defendant seeks to exclude opinion testimony from Plaintiffs' experts Dr. B. Sonny Bal, Mari S. Truman, and Reed Ayers, Ph.D. Each is addressed in turn.

### A. Opinion Testimony of Dr. B. Sonny Bal

Dr. B. Sonny Bal is a board-certified orthopedic surgeon and is currently an Associate Professor at the University of Missouri Health Center and also an Adjunct Professor of

Materials Science at the Missouri Science and Technology University-Rolla. Defendant challenges the following five opinions contained in Dr. Bal's report (Bal Report, Def.'s Mot. to Exclude Bal, Doc. 51, Ex. A) on the grounds that they are not supported by reliable principles and methods:

> A. This failure was caused by failure of the metal components, as opposed to the failure being caused by improper surgical technique or failure of the bone or supporting tissues . . . . None of the routine activities of Mr. Moore's work or personal life should have caused the modular neck to fracture. (Bal Report at 7.)

> B. All models and sizes of the Wright Medical Ti6A14V modular neck are defective and unreasonably dangerous for use as an implanted medical device. (Id. at 10.)

> C. An orthopaedic surgeon would reasonably expect that the manufacturer would have voluntarily and immediately suspended distribution of all of these modular necks until the cause of the failure(s) was found and addressed. (Id. at 7.)

> D. This conduct by the manufacturer needlessly caused patients, such as Mr. Moore, to be exposed to the unnecessary risk of serious injury, or even death, when other reasonable safe alternative were available. (Id. at 8.)

> E. Wright Medical should have used cobalt chrome instead of titanium, made its neck thicker, or used surface treatments. (Def's Mot. to Exclude Bal, Doc. 51 at 4 (Summarizing Bal Report at 9)).

Defendant generally argues that Dr. Bal's opinion regarding the cause of the alleged failure is "completely devoid of any step-by-step analysis setting forth how he arrived at his opinion." (Def's Mot. to Exclude Bal at 8.) More specifically, Defendant challenges a number of Dr. Bal's opinions on the grounds that he is unqualified to give them on account of not being a trained biomechanical engineer or metallurgist, as he acknowledged in his opinion.

In response, Plaintiffs argue that Dr. Bal's opinions are based on a differential diagnosis and that Dr. Bal is qualified to offer an opinion as to the mechanism of failure. (Pls.' Opp. Br. Re: Bal, Doc. 92 at 12.) In making his diagnosis, Dr. Bal specifies that he examined Mr. Moore's medical records, scientific literature, and other documents provided by Plaintiff's counsel. (Bal Report at 1, 5-6.) Dr. Bal also cites medical literature and Defendant's own documents in support of his specific assertion that "micromotion and fretting corrosion were well known to the orthopedic surgery implant community." (Id. at 3.) Finally, Dr. Bal possesses first-hand experience implanting PROFEMUR® modular necks in patients and has experience with those necks failing. (Id.)

The Eleventh Circuit has repeatedly recognized that "differential diagnosis is a scientifically accepted methodology [which] meets the *Daubert* guiding factors for district judges in deciding reliability." Chapman v. Proctor & Gamble Distrib.,

LLC, 766 F.3d 1296, 1309 (11th Cir. 2014). A "differential diagnosis includes three steps: (1) the patient's condition is diagnosed, (2) all potential causes of the ailment are considered, and (3) differential etiology is determined by systemically eliminating the possible causes." Id. at 1308. "A reliable differential analysis 'need not rule out all possible alternative causes,' but 'it must at least consider other factors that could have been the sole cause of the plaintiff's injury.'" Id. (quoting Guinn v. AstraZeneca Pharma. LP, 602 F.3d 1253, 1245 (11th Cir. 2010)). A review of Eleventh Circuit cases challenging opinions derived from differential diagnosis reveals that the opinion must meet three requirements: (1) generate "a comprehensive list of possible causes that are generally capable of causing" the condition; (2) "systematically and scientifically rule[] out specific causes until a final, suspected cause remains"; and (3) "show through reliable evidence that the remaining cause ruled in as actually being capable of causing the condition." Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1343 (11th Cir. 2010).

After a thorough review of the record, including Dr. Bal's expert report, the Court finds that Dr. Bal is qualified to testify in this case and that his methods are reliable subject to the exclusions and limitations discussed below. As Plaintiffs argued and Dr. Bal stated in his report, it is within an orthopedic surgeon's ability to diagnose the "basic fact of

failure." The Court finds that in ruling out surgical error and Otis Moore's weight and activity levels as causes of the device failure and ruling in micromotion and fretting corrosion, Dr. Bal conducted a proper differential diagnosis and one that he is qualified to make, particularly after reviewing the medical literature concerning modular neck implants. Accordingly, Dr. Bal will be permitted to offer opinion (a) with the limitation discussed below.

Later in his report, Dr. Bal discusses methods to remedy the fracture problems in modular necks. In particular, Dr. Bal gives opinions regarding detail and offers his opinion as to whether Defendant should have used cobalt chrome instead of titanium, made its neck thicker, or used surface treatments. (Bal Report at 9.) His discussion regarding alternative designs implicates opinions (b), (d), and (e) listed above. In his report, Dr. Bal admitted that he would have to defer to biomechanical and metallurgical experts on these topics. (Id.) On these matters, the Court agrees with Defendant; Dr. Bal lacks the qualifications to give opinions (b), (d), and (e), which concern the reasonableness of an alternative design, and necessitate engineering expertise.

In conclusion, the Court finds that opinions (b), (d), and (e) are excluded because, by his own admission, Dr. Bal lacks the qualifications in metallurgy to opine on these design defect topics. With respect to opinion (a), the Court finds that Dr.

Bal is qualified to give the opinion and the differential diagnosis he performed is reliable to diagnose device failure as a result of micromotion and fretting. (Bal Report at 6.) That opinion is consistent with his experience as an orthopedic surgeon and his review of the medical literature, Otis Moore's medical records, and Defendant's documents. Opinions (b), (d), and (e) of Dr. Bal's report concerning alternative reasonable design, require the qualifications of a biomechanical engineer and metallurgist and are not reliably determined by Dr. Bal performing a differential diagnosis. Finally, turning to opinion (c), the Court finds that Dr. Bal is qualified and his methods reliable to testify to the expectations of orthopedic surgeons. See Order at 9, Janus v. Wright Medical Tech., Inc., No. 1:11-cv-01183, (C.D. Ill. Aug. 30, 2013) ECF #57.

The Defendant's motion to exclude Dr. Bal's testimony is therefore **GRANTED IN PART AND DENIED IN PART**.

### B. Opinion Testimony of Mari Truman, P.E.

Plaintiff has disclosed the report of engineering expert Mari Truman, P.E. concerning alleged design defects and inadequate warnings in Defendant's PROFEMUR® modular neck. Defendant challenges the admissibility of Truman's opinions "because they are not the product of reliable principles and methods." (Def. Mot. to Exclude Truman, Doc. 53 at 4.) More

specifically, Defendant argues that six opinions, or types of opinions, should be excluded.

### a. Inadequate Testing

Defendant first argues that Truman's opinion that Defendant's testing was inadequate should be excluded due to her allegedly inconsistent deposition testimony from a separate case. In her report, Truman provided the following opinions:

> [Defendant's] testing was insufficient to characterize the performance of this device[] in heavier and more active individuals. [Defendant's] design and research team did not take into account the known and reasonably foreseeable loads and number of cycles applied to total hips in today's patient population when establishing their performance requirements for the Profemur modular hip components. (Truman Report, Doc. 53, Ex. A at 29.)

> Had [Defendant] set up appropriate performance testing and appropriate performance requirements for these tests[, Defendant] could have refined their design to have sufficient strength to endure in Otis Moore. (Id. at 37.)

> [Defendant's PROFEMUR®] titanium necks, and in particular, the long neck titanium implants, are defective because its 10 million cycle endurance limit (for ISO 7206-6:1992, R=.1 at 10 Hz) was too low to assure safe use in high demand (heavier and/or more active) patients. (Id. at 78.)

In Mims v. Wright Medical, No. 1:11-cv-213-TWT (N.D Ga.), Truman gave the following deposition testimony:

Q: My question is this: You know or will you agree that the testing on the [PROFEMUR®] in the United States passed the ASTM and ISO tests required by the FDA.

A: It complied with the ASTM.

Q: Will you agree that it surpassed the testing requirements of the FDA?

A. If we just limit ourselves to the FDA, yes. Or the FDA would not have cleared it.

(Truman Deposition Transcript, Doc. 53, Ex. B at 125:18-126:1.) Defendant argues that this testimony is inconsistent with Truman's opinion in this case that the PROFEMUR® system "was not properly tested and did not meet the recommended ASTM strength." (Def. Mot. to Exclude Truman at 8.)

Plaintiff, relying on a prior judicial finding in Grote v. Wright Medical Group, Inc., No. 6:12-cv-02002 (N.D. Iowa), disputes that the deposition testimony is inconsistent with Truman's report and argues that, in any event, the allegedly inconsistent statement goes to the weight the jury should afford Truman's testimony and not its admissibility.

The Court agrees with Plaintiff. Whether Truman once spoke inconsistently with her current report is not an attack on the reliability of the methodology used in her report; Defendant's proposed use of an allegedly inconsistent statement is an attack on her credibility and the weight the jury should give to her opinions. Other courts have agreed, repeatedly dismissing Defendant's same challenge to Truman's opinion. See Order at 16

<u>Grote v. Wright Medical Group, Inc.</u>, No. 6:12-cv-02002 (N.D. Iowa April 24, 2015), ECF No. 66; Order at 21, <u>Tucker v. Wright Medical Tech., Inc., et al.</u>, No. 4:11-cv-03086-YGR (N.D. Cal. Feb. 27, 2013), ECF No. 115; Opinion at 8-9, <u>Peterson v. Wright Medical Tech., Inc.</u>, 1:11-cv-01330-JES-JAG (C.D. Ill. Feb. 13, 2014), ECF No. 66. Further, the Court finds that Truman's methodology with respect to these opinions, which she described in detail, is reliable. To the extent Truman's prior deposition testimony is contradictory, Defendant may raise it at trial.

### b. **Titanium Stem with Chromium Alloy**

Defendant next challenges Truman's "opinions regarding the effect of cobalt chromium ions on the corrosion fatigue performance" of Defendant's PROFEMUR® modular necks. (Def. Mot. to Exclude Truman at 8.) Defendant alleges the opinions are "erroneous, misleading, and [] not supported by her own cited references." (<u>Id.</u>) Defendant's argument collapses into one issue: Truman's citations allegedly do not support her opinion. Truman offered the following opinion:

> In modular implants, the bearing couple may also alter the potential for fretting. As a result, some combinations of [metal on metal] articulations and [cobalt chromium] femoral stem designs/materials have exhibited excessive and unusual corrosion, resulting in premature failure . . . .

(Truman Report at 96 (citing S.T. Donnell, et al., <u>Early Failure of the Ultima Metal-on-metal Total Hip Replacement in the</u>

Presence of Normal Plain Radiographs, J. Bone Joint Surgery 1501-08 (Nov. 2010)). According to Defendant, Truman's citation to the Donnell, et al. paper does not support, and in some instances contradicts, her opinion that metal-on-metal articulation and cobalt chromium designs exhibited excessive and unusual corrosion. Similarly, Defendant contends the following opinion is contradicted by her citations:

> Even in the absence of [metal on metal] articulations, combining a titanium stem with a [cobalt chromium] alloy bearing using a taper interface has been shown to lead to corrosion and this corrosion may have contributed to implant fracture at modular taper junctions.

(Id. at 96-97 (citing, e.g., J.R. Goldberg, et al., A Multicenter Retrieval Study of the Taper Interfaces of Modular Hip Prostheses, Clinical Orthopaedics and Related Research 149-61 (Aug. 2002))) Defendant contends that the Goldberg, et al. article contradicts her opinion that "using a cobalt-chromium neck with the titanium PROFEMUR® stem is a feasible alternative design." (Def. Mot. to Exclude Truman at 9.) In response, Plaintiffs again contend that Defendant's argument addresses weight and not admissibility.

After scouring the record, the Court cannot find where Defendant provided either the Donnell or Goldberg articles. Without those articles, the Court is at a loss to understand how it can evaluate Defendant's allegation that Truman's report is

misleading or a mischaracterization of those citations. From the record as it exists, the Court finds the above opinions are based on reliable methodology. See also Order at 17, n.4, <u>Grote v. Wright Medical Group, Inc.</u>, No. 6:12-cv-02002 (N.D. Iowa April 24, 2015), ECF No. 66 (noting that the Goldberg et al. article actually supports Truman's opinion).

### c. Surface Treatments

Defendant challenges Truman's opinion that, had Defendant used alternate surface treatments, "[Otis Moore's] hip implant would not have prematurely failed." (Def. Mot. to Exclude Truman at 10.) Defendant summarizes and characterizes Truman's opinion as follows:

> Wright Medical's failure to employ alternate surface treatments such as low plasticity burnishing (LPB) or laser shock preening (LSP) to improve fatigue strength and inhibit crack formation caused Plaintiff's implant to fail prematurely, causing his injuries.

(Def. Mot. to Exclude Truman at 3 (summarizing Truman Report at 45-49.))[2] As evidence of the unreliability of her opinion, Defendant points to the lack of documentation on the corrosion resistant properties of LPB or LSP. (Id. at 10-11.) Further, Defendant argues that "[s]imply listing other processes used by other manufacturers on different implants or by other industries

---

[2] Defendant's motion appears to misidentify where these statements come from in Truman's report. It cites pages 36 through 37, but the summary more accurately describes pages 45 through 48.

altogether provides an insufficient basis to form an opinion on the effectiveness of these treatments as to Plaintiff's implant." (Id. at 11.) Defendant also argues that the manufacturer Truman uses as an example experienced significant failures in their products during the relevant time period. (Id.)

The Court finds that Truman is qualified to opine on alternative surface treatments. Further, the Court finds that Truman employed a reliable methodology in reaching her opinion that other surface treatments could improve fatigue strength and inhibit crack formation. Truman reviewed and discussed the literature addressing the alternative treatments' resistant qualities and how those qualities were known to the industry. (Truman Report at 45-49.) Defendant's argument that a manufacturer using these alternative methods in fact had a significant failure rate goes to the weight of Truman's opinion, but not the reliability of her methodology.[3]

---

[3] Earlier in her report, Truman discussed an article by Paliway, et al. and remarked that "it is likely that most of the designs that failed] were untreated Titanium alloy designs." (Truman Report at 23-24. (citing M. Paliwal, et al., Failure Analysis of Three Uncemented Titanium-Alloy Modular Total Hip Stems, 17 Engineering Failure Analysis 1230-1238 (2010)). Defendant argues that Truman misused the source because she does not know whether the implants discussed had surface treatments. Defendant's argument fails because—once again—the article is not in the record, and the Court cannot evaluate whether Truman's citation is improper. From the Court's review of the record, Truman's report is reliable; Defendant may, of course, attempt to undermine the report's credibility by cross-examining Truman's knowledge of her sourced materials.

### d. Failure Rate

In her report, Truman gave the following opinion regarding the Defendant's PROFEMUR® Necks:

> [T]he current North American long neck fracture rate of 1.31% (1.33% with extra-longs included) is not acceptable to the industry

(Truman Report at 60.)  She further opined that:

> The [Wright Medical] titanium long modular neck fracture rates exceed what is an acceptable rate of premature fracture in the industry for an artificial femoral neck or an artificial femoral stem, and is an unacceptable failure rate.

(Id.)  Defendant argues that Truman's opinion that a 1.31% failure rate is not acceptable in the industry is unreliable, and, further, that the opinion is not helpful to the trier of fact because Truman never opined regarding whether the .89% failure rate of the whole medical industry is reasonable.  More generally, Defendant argues that Truman's failure to provide any opinion on what an acceptable rate of failure is in the medical device industry renders her opinion unreliable.  (Def. Mot. to Exclude Truman at 10-11.)

Plaintiffs' response argues that Truman is qualified to give the opinion, an argument not raised by Defendant, but does not address whether the opinion is based on reliable methodology.  (Pls.' Opp. Br. Re: Truman, Doc. 91 at 17-19.) Truman's methodology primarily constitutes a comparison between

18

Defendant's failure rate of .148%, under Truman's calculations, to Aesculap AG, a competing manufacturer who replaced their titanium necks with cobalt chrome necks after experiencing a .06% failure rate. Based on this comparison, Truman concluded that Defendant's failure rate exceeds industry standards.

The Court acknowledges that Truman's failure rate opinion is not her mere *ipse dixit* opinion. Nevertheless, the Court questions the reliability of comparing Defendant's product to a single competitor. Although the Court can imagine an industry where comparing one product or one market participant's failure rate is sufficient to approximate an industry-wide failure rate, the medical-device industry and the market for hip implants does not intuitively appear to be such a market.[4] Plaintiffs have provided no explanation for why such a narrow comparison constitutes a reliable method in this case. "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." <u>Allison v. McGhan Med. Corp.</u>, 184 F.3d 1300, 1306 (11th Cir. 1999). Plaintiffs have failed to meet their burden of demonstrating the reliability of Truman's methodology.

_____

[4] One example of a market where narrow comparisons between few participants might be necessary to establish a failure rate is one where many of the devices are covered by patents and the number of participants is therefore limited.

### e.  Warnings

Defendant challenges Truman's opinions relating to product warnings on the grounds that she is unqualified to opine on product warnings.  In her report, Truman stated that

> [t]he warning pages supplied by [Defendant] for this device were insufficient concerning weight and/or activity restrictions to prevent implant overload, failure and patient injury.

(Truman Report at 63.)  Defendant argues that Truman lacks the requisite qualifications to give this opinion because she is not a doctor or surgeon.  Plaintiff responds that Truman has worked as a biomechanical engineer for thirty years and has been "involved in both the creation and review of warnings and precautions provided in package inserts and surgical techniques."  (Doc. 91 at 20.)

The Court finds that Truman is qualified to give her opinion regarding the sufficiency of the warnings.  According to Truman, determining the contents of a manufacturer's warning consists of a two-way dialogue between engineers on a product's design team and relevant medical practitioners, including surgeons.  (Truman Report at 3.)  Truman's professional experience includes "the creation and review of warnings and precautions provided in package inserts and surgical techniques for well over a dozen orthopaedic product families for about a dozen different orthopaedic companies."  (Id. at 2.)  Defendant

may wish to question Truman regarding whether her lack of medical experience makes her opinion less credible, but that question goes to the appropriate weight of her testimony. Truman is unquestionably qualified to testify based on her professional experience creating and reviewing warnings.

The Court notes that the cases cited by Defendant are distinguishable. To begin, in Gebhardt v. Mentor Corp., 15 F. App'x 540 (9th Cir. 2001), the Ninth Circuit affirmed the district court's exclusion of an engineer who intended "to offer an opinion as to how a warning label would have affected a surgeon's decision to use the Angelchick device." Id. at 542. In this case, Truman's testimony concerns the adequacy of the warning and does not attempt to predict whether Dr. Corpe would have proceeded with the surgery had he received an adequate warning. With respect to qualifications, in Squires v. Goodwin, 829 F. Supp. 2d 1041 (D. Colo. 2011), the district court excluded an expert who "ha[d] never been employed by a company that designs or manufactures ski equipment for disabled skiers," and had never "written or designed product warning labels or instructions." Id. at 1050. Truman, on the other hand, has been "a designer, development team member, and more recently a consultant to [the orthopaedic] industry," and has "been involved in both the creation and review of warnings and precautions provided in package inserts and surgical techniques for well over a dozen orthopaedic product families for about a

dozen different orthopaedic companies." (Truman Report at 2.)
And in <u>Bourelle v. Crown Equipment Corp.</u>, 220 F.3d 532 (2000),
the court excluded an expert's opinion regarding a warning label
because his failure to draft a proposed alternative warning
label rendered his opinion unreliable and not because the expert
was unqualified. <u>Id.</u> at 539. Finally, in <u>Magoffe v. JLG Indus.</u>
<u>Inc.</u>, No. 06-cv-0973-MCA/ACT, 2008 WL 296753 (D. N.M. 2008), the
Court found that the expert's opinions were unreliable, not that
he was unqualified as Defendant asserted. <u>Id.</u> at *25. None of
these cases addresses the qualifications of an engineer who has
a substantial history of developing medical devices and
preparing warning instructions to testify to the adequacy of a
warning on such a device. In sum, these cases are off-point.
Truman may give this opinion.

### f. Alleged Legal Conclusions

Finally, Defendant challenges Truman's following opinions:

> [Defendant] unreasonably exposed Otis Moore
> to hazards of premature implant fracture and
> subsequent bone and soft tissue injury, pain
> and revision total hip surgery. The
> combination of hazard and exposure makes the
> WMT PROFEMUR® product unreasonably dangerous
> and unsuitable for its intended purpose.

> [Defendant] knew or should have known that
> this design was more susceptible to
> premature fracture than other hip implant
> stems.

> Otis Moore did not act or react improperly
> in a manner that caused or contributed to
> his injury.

> [Defendant's] brochures imply superior
> strength of the PROFEMUR® hip stem assembly
> when compared to other hips, but are
> misleading because the clinical relevance of
> the testing was not discussed.

> [Defendant's] PROFEMUR® Modular femoral
> implant system has design and warning
> defects which caused premature failure of
> this implant in Otis Moore causing his
> injuries.

(Truman Report at 81-83.) Defendant argues that these opinions are actually legal conclusions masquerading as expert opinions and are therefore not helpful to the jury. See Fed. R. Evid. 702(a). In response, Plaintiff argues that Daubert and Rule 702 concern challenges to the reliability of "principles and methodology, not . . . the conclusions that they generate." (Doc. 91 at 23.) Plaintiffs' argument misses the point. Defendant's argument is not a challenge to the substance of her conclusions; rather, Defendant argues that Truman's legal conclusions are unhelpful to the jury and should be excluded on those grounds. See Fed. R. Evid. 702(a); Frazier, 387 F.3d at 12.

The Federal Rules of Evidence provide that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). That "just because" is key, however, because such opinions are regularly objected to as unhelpful to the trier of fact. See Fed. R. Evid. 702(a). The Eleventh Circuit, therefore, distinguishes between opinions as to ultimate issues of fact, which are permitted, and those which

embrace legal implications, which may be excluded. <u>Montgomery v. Aetna Cas. & Sur. Co.</u>, 898 F.2d 1537, 1541 (11th Cir. 1990). An opinion that embraces a legal conclusion is inadmissible because it is unhelpful to the trier of fact. Fed. R. Evid. 704 advisory committee's note. Further, the Eleventh Circuit has emphasized that a "witness . . . may not testify to the legal implications of conduct" because "the court must be the jury's only source of law." <u>Montgomery</u>, 898 F.2d at 1541.

With that groundwork laid, the Court finds that some of Truman's opinions, as phrased in her report, are legal conclusions. In particular, the following opinions reflect, in part, legal conclusions that are inadmissible under Rule 702 and <u>Montgomery</u>:

> [Defendant] unreasonably exposed Otis Moore to hazards of premature implant fracture and subsequent bone and soft tissue injury, pain and revision total hip surgery.

> [Defendant's] PROFEMUR® Modular femoral implant system has design and warning defects which caused premature failure of this implant in Otis Moore causing his injuries.

(Truman Report at 81-83.) Truman will not be allowed to testify to legal conclusions in this manner at trial. Though the legal conclusions contained in these opinions will not be allowed, as discussed regarding the preceding opinions, the Court has found that Truman employed sufficiently reliable methodology to arrive

at her factual conclusions, which she will be allowed to testify to.[5]

In conclusion, the Court therefore **GRANTS IN PART** and **DENIES IN PART** Defendant's Daubert motion to exclude Truman.

### C. Opinion Testimony of Reed Ayers, Ph.D.

Plaintiffs have disclosed Reed Ayers, Ph.D., who is an aerospace engineer presently employed as a research assistant professor in orthopedics at the University of Colorado, Denver, School of Medicine, as an engineering expert in this case. (Ayers Disclosure, Doc. 54, Ex. A at 1-2.) The stated purpose of Dr. Ayers' report "was to determine the failure mode of the failed hip implant and to comment on the conditions that likely lead [sic] to failure of the device." (Ayers Report, Doc. 54, Ex. B at 1.)

Defendant moves to exclude seven of Dr. Ayers's eight conclusions. (Def.'s Mot. to Exclude Ayers, Doc. 54 at 5, n.4.)

---

[5] To distinguish between factual and legal conclusions, the discussion in the advisory committee's note to Federal Rule of Evidence 704 is illustrative. The committee distinguished the question, "Did T have capacity to make a will?" from the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" Fed. R. Evid. 704 advisory committee's note. According to the committee, the former should be excluded as an opinion "phrased in terms of inadequately explained legal criteria." Id. The latter, on the other hand, is helpful to the trier of fact and is permissible. Id. Truman will be allowed to testify in a similar fashion, but will not be allowed to parrot Plaintiff's closing arguments, see Frazier, 387 F.3d at 1262-64, and her testimony will not be allowed to stand in for the Court's instructions on the law. See Montgomery, 898 F.2d at 1541.

In its brief, Defendant groups the conclusions by three types of objections: (1) conclusions that are "speculative, incomplete, and will not assist the trier of fact"; (2) those that are "unreliable, not supported by sound methodology, and will confuse, rather than assist the trier of fact"; and (3) with respect to defective design, that his conclusions that are "conclusory, incomplete, and will not assist the trier of fact." (Id. at 9, 11, 13 (alterations omitted)).

### a. Allegedly Speculative and Incomplete Opinions

Defendant objects to Dr. Ayers's conclusions 2, 3, and 5 on the grounds that Ayers admits that his examination of Moore's modular neck was "preliminary" and that "further destructive testing is necessary."[6] Defendant's view is that these

---

[6] Conclusions 2, 3, and 5 provide as follows:

**Conclusion 2:**

> Material defects as the result of manufacturing or alloy processing can not be definitively determined using non-destructive methods (SEM, EDAX, Fractography). Metallography may be used to verify the lack of alpha case and correct microstructural phase distribution for an $\alpha/\beta$ Ti6Al4V alloy.

**Conclusion 3:**

> EDAX measurements indicate the alloy does not conform to ASTM standards for biomedicalTi6Al4V. Material composition can not be definitively determined using non-destructive methods. EDAX is semi-quantitative and dependent on interaction volume. Subsequent destructive methodologies (metallography, inert gas fusion analysis for interstitial elements – O, N, H) may be employed

26

conclusions "are so incomplete as to be inadmissible as irrelevant." (Id. at 11.) In support, Defendant cites a footnote in Bazemore v. Friday, 478 U.S. 385, 400, n.10 (1986) (Brennan, J., concurring, joined by the whole court). Footnote 10 states, in full, that "[t]here may, of course, be some regressions so incomplete as to be inadmissible as irrelevant; but such was clearly not the case." Lifted from all context, the footnote lends support to the proposition that some expert testimony that is incomplete may be inadmissible as irrelevant. But context is key. Here is that footnote's context regarding the regression analysis at issue in Bazemore:

---

to verify if the device material meets ASTM requirements.

**Conclusion 5:**

In CAPA Action 172, the conclusions for Items C1, C2, C3, state that the manufacturing process at the machining and surface are unlikely causes for the failures. However, I have not seen any documents demonstrating that Wright Medical conducted any metallurgical analysis as a part of CAPA 172 to verify that the manufacturing process, e.g. annealing for stress relief post machining, does not modify the alloy microstructure. I would expect that if such metallurgical analysis had been conducted, Wright Medical would have referenced such analysis and verification in its CAPA 172.

> The Court of Appeals erred in stating that
> petitioners' regression analyses were
> unacceptable as evidence of discrimination,
> because they did not include all measurable
> variables thought to have an effect on
> salary level. The court's view of the
> evidentiary value of the regression analyses
> was plainly incorrect. While the omission of
> variables from a regression analysis may
> render the analysis less probative than it
> otherwise might be, it can hardly be said,
> absent some other infirmity, that an
> analysis which accounts for the major
> factors must be considered unacceptable as
> evidence of discrimination. Normally,
> failure to include variables will affect the
> analysis' probativeness, not its
> admissibility.

Id. at 400 (internal citations, quotations, and footnote 10 omitted). The Eleventh Circuit has expanded on this point, noting that "in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." Rosenfeld v. Oceania Cruises, Inc., 654 F.3d 1190, 1993 (11th Cir. 2011) (quoting Hemmings v. Tidyman's Inc., 285 F.3d 1174, 1188 (9th Cir. 2002)).

Though the present case does not concern variables in a regression analysis, Dr. Ayers's report is similar in at least one respect: it is not perfect. To Defendant's dismay, however, Plaintiffs "need not prove [their product's liability claim] with scientific certainty; rather [Plaintiffs'] burden is to prove [their claim] by a preponderance of the evidence." Bazemore, 478 U.S. at 400. So, even though Dr. Ayers admits

that a definitive determination would necessitate destructive analysis (a subject Defendant is free to examine on cross-examination), his expert report as is reflects a reliable scientific inquiry into the existence of any defects. The Court therefore finds these opinions are admissible.

### b. Allegedly Unreliable, Unsupported, or Unhelpful Opinions

Defendant moves to exclude Conclusion 1 and its associate analysis paragraph. Conclusion 1 provides that:

> [The PROFEMUR® modular neck] [d]evice failed through a combination of fretting, stress crack corrosion and fatigue.

(Ayers Report at 7.) In the analysis section, Dr. Ayres describes the "stress crack corrosion theory," and specifically notes that the [beta] phase of one of the microscopic structures of the implant's titanium alloy is "highly susceptible to corrosion." (Id. at 6.) Additionally, Dr. Ayers states that "surface roughness enhances the fretting process through a 'stick and release' mechanism when in contact with other machined surfaces, such as those in the femoral stem." (Id.)

Defendant claims that Dr. Ayers has this analysis backward on both points. Pointing to the report of Defendant's expert Dr. Brad James, Ph.D., Defendant argues that, in actuality, it is the alpha phase that is susceptible to stress cracking

corrosion and that highly polished surfaces, rather than rough surfaces, cause worse fretting damage.

As Defendant's argument shows, Dr. Ayers's testimony is discernable and rooted in real science; indeed, Dr. James's own report shows that these matters are empirically testable. See Quiet Tech., 326 F.3d at 1346. Further, Dr. Ayers will be subject to cross-examination from Defendant who may raise Dr. James's contrary conclusions and question why Dr. Ayers's views are "backwards." "Accordingly, this is not a case where the jury was likely to be swayed by facially authoritative but substantively unsound, unassailable expert evidence." Id. Moreover, Defendant questions the conclusion Ayers reached, rather than focusing on the reliability of his methodology. Defendant has it backwards. "When analyzing a witness's reliability, courts must be careful to focus on the expert's principles and methodology rather than the scientific conclusions that they generate." Daubert, 509 U.S. at 595. The Court therefore **DENIES** Defendant's motion to exclude with respect to Conclusion 1.

Defendant also seeks to exclude Dr. Ayers's conclusion 7 and its associated analysis on the grounds that it is "not tied to the facts of this case," and "cannot assist the trier of fact." (Def.'s Mot. to Exclude Ayers at 13.) Conclusion 7 provides as follows:

> Defendant's acceptance of ▉/year[7] of
> fretting wear debris may be excessive based
> on increased reports of patients with
> titanium allergies as the result of
> orthopedic implants.

(Ayers Report at 8.) Earlier in the report, Ayers explained that "even if no catastrophic failure (complete fracture of the device is present, titanium and other particles are released in to the body to be taken up into the tissues possibly causing detrimental diseases." (Id. at 7.) He continued, "[t]he conclusion is that even if the hip did not fail catastrophically, there is an increased likelihood that the hip would have failed due to osteolysis as the result of fretting debris accumulating in the patient bone tissue." (Id.)

As Defendant points out, Dr. Ayers's deposition testimony in the Stachurski case undermines the reliability of his methodology regarding titanium allergies and osteolysis causing implant failure in this case.[8] Daubert instructs courts to consider the following four factors: (1) whether the theory or technique can be tested; (2) whether it has been subject to peer review; (3) whether the technique has a known or potential rate

_____

[7] Defendant filed a redacted version of Ayers's report. This redaction is consistent with the redactions the Magistrate Court ordered in Mari Truman's report. (Doc. 90).

[8] The Court notes that Dr. Ayers's prior testimony is different in kind from the testimony Defendant relies on in its argument to exclude Mari S. Truman's opinion. Truman's testimony allegedly contradicted her conclusion in this case. Dr. Ayers's testimony, on the other hand, demonstrates that his methodology does not meet Daubert's reliability requirements.

of error; and (4) whether the theory has attained general acceptance in the relevant community. Daubert, 509 U.S. at 593-94. And though these factors are illustrative, rather than exhaustive, Frazier, 387 F.3d at 1262, the Court finds that these factors accurately reflect the kind of opinion represented in Dr. Ayers's conclusion 7.

In applying these factors, the Court finds that Dr. Ayers admits that his theory that titanium alloy fretting can cause osteolysis leading to device failure has not been subject to peer review and has not gained general acceptance in the community. (Ayers Depo., Doc. 51, Ex. D at 52-56.) Most importantly, Dr. Ayers's opinion, which is consistent with his testimony in a separate case, states that titanium allergies "possibly" caused Otis Moore's implant to fail, and that he was unwilling to state that osteolysis was a cause of failure to a reasonable degree of scientific certainty. (Ayers Report at 7-8; Ayers Depo. at 49:16-50:4.) Similarly, he was not willing to quantify the increase in likelihood that the hip would fail due to osteolysis. (Id. at 50:23-51:21.)

Although Dr. Ayers's theory regarding titanium allergies and osteolysis may one day be reliable, at present it is too speculative. The Court therefore excludes conclusion 7 as unreliable under Daubert and Federal Rule of Evidence 702.

### c. Allegedly Conclusory, Incomplete, and Unhelpful Opinions

In this portion of its motion, Defendant turns its attention to conclusions 1, 6, and 8. Those conclusions provide:

> Conclusion 1: Device failed through a combination of fretting, stress crack corrosion and fatigue.
>
> Conclusion 6: Per recent clinical and scientific literature, fretting induced corrosion is common in modular implants, indicating an ongoing design issue and that this concern should have been considered in implant design.
>
> Conclusion 8: Given the susceptibility of Ti6Al4V to fretting corrosion and stress crack corrosion, it is a poor candidate for the chosen design of the modular neck or [sic] the Profemur hip system.

(Ayers Report at 7-8.) Defendant first criticizes Dr. Ayers's recommendation against using titanium on the grounds that: (1) Dr. Ayers has previously recommended titanium; (2) Dr. Ayers is unfamiliar with the tests Defendant performed for purposes of FDA clearance; and (3) his proposed alternative alloy, cobalt chromium, is also susceptible to fretting and corrosion. (Id. at 14.) All three arguments are subjects for cross-examination and do not detract from the reliability of Dr. Ayers's report, which specifies the literature he relied on and his method of examining Moore's PROFEMUR® modular neck implant.

Defendant's second argument against these conclusions is that "Dr. Ayers' second design recommendation to increase the

cross-section of the PROFEMUR neck fails for its lack of specificity." (Id.) More specifically, Defendant criticizes Dr. Ayers's inability to opine on how much larger to make the neck, the specific location to increase, and his lack of familiarity with necessary design tradeoffs. (Id. at 14-15.)

These are odd objections for the simple reason that Dr. Ayers's report does not opine on an alternative design that required increasing the size of the neck. Defendant is relying on Dr. Ayers's deposition testimony in a different case, where Defendant questioned him regarding design alternatives. (Id., Ex. D.) At this point, the Court has no reason to think that Dr. Ayers intends to testify that Defendant should increase the size of the modular neck. To summarize Dr. Ayers's conclusions, it appears his testimony will address the cause of failure in Otis Moore's particular hip implant, the susceptibility of the titanium used in Defendant's hip implants to fretting and stress crack corrosion, and why that titanium is a poor design choice. Of course, the existence of a reasonable alternative design will likely play an important role in balancing the risk of Defendant's product against its utility. See Banks v. ACI Americas, Inc., 450 S.E.2d 671, 674 (Ga. 1994) (noting that "[o]ne factor consistently recognized as integral to the assessment of the utility of a design is the availability of alternative designs, in that the existence and feasibility of a safer and equally efficacious design diminishes the

justification for using a challenged design."). But Truman, Plaintiffs' engineering expert, has provided an opinion on alternative designs, and presently there is no indication that Dr. Ayers intends to. Accordingly, the Court denies Defendant's motion to exclude Dr. Ayers's conclusions 1, 6, and 8.

## IV. CONCLUSION

As discussed above, the Court **DENIES** the bulk of Defendant's Daubert motions. The Court **GRANTS** Defendant's motions with respect to the following opinions:

- **Dr. Sonny Bal**: Opinions (b),(d),(e).
- **Mari Truman**: The failure rate opinion and legal conclusions discussed above.
- **Dr. Reed Ayers**: Conclusion 7.

The rest of the Defendant's objections to Plaintiffs' experts' opinions are **DENIED**.

**ORDER ENTERED** at Augusta, Georgia, this 31ST day of March, 2016.

_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA